E-FILED
Tuesday, 16 November, 2021  12:00:18 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT**
United States District Court for the Central District of Illinois

| | |
|---|---|
| **MICHAEL HENRY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )**Civil Action No** |
| | ) |
| **UNITED STATES OF AMERICA** | ) |
| **VILLAGE OF ORLAND PARK** | ) **Complaint and Demand** |
| **KLEIN,THORPE AND JENKINS** | ) |
| **KEITH PEKAU INDIVIDUALLY** | ) |
| **KWAME RAOUL – ILLINOIS** | ) |
| **ATTORNEY GENERAL** | ) |
| **US Attorney John R. Lausch Jr** | ) |
| **Howard Jablecki Individually** | ) |
| **Dennis Walsh Individually** | ) |
| **George Koczwara Individually** | ) |
| **Cindy Nelson Katsenes Individually** | ) |
| **Judge Thomas Murphy** | ) |
| **Defendants.** | ) |

## NATURE OF THE CASE AND OVERVIEW

1.     This suit is brought against the United States of America ("USA") and

the United States Attorney John Lausch for his failure to stop the Public

Corruption in Orland Park and the Bribery and solicitation of Bribes By

Cook County Judges  Specifically Thomas Murphy of the Bridgeview

Court House and the Cook County Democratic Party.  On two occasions a

person claiming to represent Murphy and the Cook County Democratic

Party demanded a 10,000 campaign contribution to follow the Law and dismiss  case 2020 M5 000698 in the Bridgeview Court House exhibit I.

2.      Plaintiff Henry Filed a proper motion to dismiss the suit for the failure of the Village of Orland Park to properly plead a lawsuit. In the Lawsuit Plaintiff Henry specifically told Judge Murphy that the case must be dismissed because the Village of Orland Park Failed to plead that that the calls were made with a specific type of  software. Judge Murphy was told the TCPA was not filed in accordance with the law and plead properly and he ignored the law and refused to  enter a ruling detailing his reasons for denying the motion.  Specifically the lawsuit fails to give a day of the alleged calls,   the lawsuit fails to specify the number the calls were made from, the lawsuit fails to establish the message was a business call and does not even give the verbiage of the message,  the lawsuit fails give the name of the person who received the call or the phone number who received the call, the lawsuit fails to establish that a ATDS ( Automated telephone dialing system was used) the lawsuit fails to establish that the calls were randomly generated.  Had this not been filed in State Court  the case would  have been dismissed in Federal Court under Rule 12 for failure to plead the case properly.  Instead it was filed in Cook County State Court and the Judge is soliciting bribes to dismiss the suit.

3.      On Information and Belief Howard Jablecki and the

Law firm of Klein Thorpe and Jenkins made various campaign contributions

in order to keep this lawsuit open and billing the Village of Orland park for

services so they could continue to kick back payments to Keith Pekau.

4.      Immediately after the Filing of the motion to dismiss Plaintiff Henry

Started receiving phone  calls  from a person Representing Judge Thomas

Murphy soliciting a 10  thousand dollar payment – 2500 To Judge Murphy's

Campaign fund 2500 Dollars to  Timothy Evans Campaign Fund 2500

dollars to Michael  Madigan's  Campaign fund and 2500 Dollars  to the

Cook County  Democratic Party.  The Caller stated that when the  donation

occurred the case would be Dismissed in accordance with the law.   Judge

Thomas Murphy was previously an Alderman in the City of Chicago were

the Federal  Government is constantly indicting Political corruption for

bribery and Kick backs and Murphy learned the ropes of Public corruption

from his post as an alderman in Chicago.

5.      The Village of Orland Parks failure to properly plead the entire

Lawsuit and It's Lawyer Howard Jablecki and Mayor Keith Pekau knew this

Fact but kept the lawsuit going for bribes to Mayor Keith Pekau.

6.    The Mayor of Orland Park Keith Pekau has created a series of bogus

Lawsuits where Attorneys Dennis Walsh  and Howard Jablecki bill the

Village of Orland Park hundreds of thousands of Dollars in legal fees and

then Kick back a percent of the fees to Keith  Pekaus campaign Fund the

total kicked back is 21,000 dollars so far.

7.    The Taxpayers paid over 100,000 thousand dollars to sue the

Governor of  the State of Illinois and Pekau was paid 5 thousand dollars in

Kick backs to approve the lawsuit see the Village Of Orland Park et al v.

Pritzker, No. **1**:2020cv03528 Northern District of Illinois.  The Judge told

the Village it had no case .  In an effort to support this fabricated lawsuit

Howard Jablecki had his children Charlie and Lanie participate in a Rally

trying to gain Public Support for the bogus lawsuit against Pritzer.

8.    The Law firm of Klein Thorpe and Jenkins billed the taxpayers

for the lawsuit for Howard Jablecki to attend the Rally where he had his

children speak to support the bogus lawsuit that they billed over 100

thousand dollars to the Taxpayers

From the Reporter Newspaper September 23, 2020

**Charlie Jablecki, a sixth-grader at Century Junior High in Orland Park, spoke
about how much he wants to return to regular classes during a rally against remote
learning at Crescent Park in Orland Park. His younger sister, Lanie, standing
beside him, also talked about how much she wants to go to fourth grade at her
school. (Photo by Dermot Connolly)**

9.      In the Cook  County Court case the Village attorneys have collected

over  150 thousand Dollars in fabricated billings even after he was informed

that  the United States Supreme Court ruled that a TCPA Claim could not be

made without specifying the dialer and capabilities of the Dialer that did not

happen in the Cook County Case  2020 M5 000698

10.     Attorney Jablecki was notified in May of 2021 that the United States

Supreme Court Defined what exactly was required by Federal Law

Exhibit II.

*Held: To qualify as an "automatic telephone dialing system" under the
TCPA, a device must have the capacity either to store a telephone number
using a random or sequential number generator, or to produce a telephone
number using a random or sequential number generator.
Pp. 4–12.*

**11.      At it's face the lawsuit 2020 M5 00698  is deficient and fails to meet the**

**required  pleading of the TCPA. This suit fails to even plead that an ATDS was even**

**used and would have been dismissed Immediately in a Federal Court.**

**12.      The Village of Orland Park Ignored Federal Law and filed this case in State**

**court where it new it could Provide Campaign donations to keep the suit moving**

**and Judge Murphy is Demanding 10 thousand dollars of Campaign Contributions**

**to  dismiss the lawsuit**

**CERTIFIED COPY OF USCA JUDGMENT dated 2/19/2020 regarding notice of appeal 88 ; USCA No. 19-1738 : The judgment of the District Court is therefore AFFIRMED, with costs, in accordance with the decision of this court entered on this date. (sxb, ) (Entered: 03/30/2020)**

13.     In the midst of chaos over the proper definition of the statutory term "automated telephone dialing system," the Northern District of Illinois reminds us that the plain language of the TCPA still matters.  In granting summary judgment to AT&T in *Gadelhak v. AT&T Servs*., No. 17-cv-01559 (March 29, 2019), the Court found that AT&T's texting system did not qualify as an ATDS because the system did not "store" telephone numbers "using a random or sequential number generator" as the numbers were dialed from a predetermined list.

14.     The lawsuit arose from AT&T survey texts sent to customers who had engaged in qualifying transactions with a customer service representative. The plaintiff filed a putative TCPA class action against AT&T alleging that he received 5 survey text messages from AT&T in Spanish—though he was not a customer of AT&T or any of its affiliates, did not speak Spanish, and had registered his phone number on the DNC Registry.

15.     AT&T maintained that its system was only designed to text AT&T customers and that the plaintiff's number "must have been erroneously listed" on an account.  The record evidence revealed that AT&T's computer

system would first identify all phone numbers on accounts with customer-
service transactions, send the list of phone numbers  to marketing for
processing, and then whittle the list down to only the first cell phone
number listed on the relevant accounts.  AT&T's vendor would send the
text-message surveys out to this reduced list of cell phone numbers.

16.    In addition it is  Brought against the State Of Illinois and the Illinois
Attorney General for it's failure to prevent the Judicial system from
Soliciting bribes in order to dismiss cases
Third it is brought against the Village of Orland Park for filing and creating
Perjured Affidavits in order to confuse a Cook County Judge and allow for
the bribery to occur.

17.    This lawsuit is against the Village of Orland Park for it's illegal filing
 of  Lawsuits  and Orland Parks fabrication of Suits and
Illegally filing suits in State Court and withholding and concealing illegal
application of Federal Law, and allowing Klein Thorpe and Jenkins to
bill in excess of 250 dollars for fraudulently filed lawsuits and Kicking back
20 thousand dollars to Mayor Keith Pekau and Against George Koczwara
Individually for participating in mail and wire fraud – Defamation of
Character and slander.

18.    This suit is Brought against the Law Firm of Klein Thorpe and

Jenkins and  it's Managing partner Dennis Walsh Individually for Illegally

filing lawsuits and  Concealing lawsuits in violation of Federal Law.

19. This suit is Brought against Keith Pekau  Individually, Cindy Nelson

Katsenes Individually, Dennis Walsh Individually and Howard Jablecki

Individually  for Slander, Libel and defamation of character

Claiming Michael Henry is responsible for Robocalls in newspapers, press

Releases public and private meetings and to campaign contributors and for

Keith Pekaus  criminal Violation of the Honest  service clause and creating a

criminal enterprises to defraud the Citizens of  Orland Park with the Help of

Dennis Walsh Individually and the diversion of  taxpayer  funds to pay for

Legal Services to Private Individuals, cause the  Village to  overbilled on

goods and  services purchased so kick back Campaign Donations can be

Given to Keith Pekau.

## **JURISDICTION**

20.    Jurisdiction over this action is based on 28 U.S.C.  Part IV, Chapter

 85 Sections 1331

## VENUE

21.     Venue in this district is proper under 28 U.S.C.  Part IV, Chapter 87 Section 1391, Section 1402  and Section 1442 because the Illinois Attorney Generals Main office is in Springfield Illinois


## BACKGROUND

22.     Politician Keith Pekau has led Public Corruption and been violating Federal law and the Right to honest services in criminal Violation of 18 U.S.C. 1346

23.     Keith Pekau is the Mayor of Orland Park and since his election the Mayors office has been for sale to the highest bidder.

24.     Horton insurance paid a consulting company owned by Keith Pekau 75 Thousand dollars and was awarded the Village of Orland Parks insurance business.

25.     Twin Peaks Restaurant was ticketed and under Criminal investigation by the Village of Orland park.  Keith Pekau as Mayor was the Liquor control commissioner.

26.     Twin peaks restaurant paid Pekau Campaign fund a "donation" of 1500 hundred dollars and the charges were dropped ending the potential loss of liquor license.

27.     Keith Pekau took a 5 thousand dollar campaign contribution from Ziegler Auto group and 30 days later voted for cash incentives in excess of half a million dollars and favorable zoning to be awarded by the Village of Orland Park

28.     Keith Pekau has taken 21 thousand dollars in campaign contributions from the Law Firm of Klein Thorpe and Jenkins and in violation of Illinois bid laws failed to bid out the Village Legal services and causing the Taxpayers of Orland park to pay in excess of three hundred thousand dollars a year in Legal fees to an illegal no bid contract under Illinois law.

29.     Dennis Walsh is the Managing Partner of Klein Thorpe and Jenkins and individually acts as private counsel to Keith  Pekau on his illegal campaign contribution solicitations.

30.     Keith Pekau extorted a full Country club Membership from Crystal Tree country Club in Violation of the State of Illinois law as Keith Pekau also acts as the Liquor Commissioner.

31.    Keith Pekau receives a 7 Thousand dollar a year golf Membership From Crystal Tree and Pekau actually regulates Crystal Trees Liquor License.

32.    Plaintiff Henry has been doing freedom of information request against The Village and worked with multiple news sources to expose Pekau's Illegal  activities.

33.    The Public corruption of Keith Pekau has also been exposed in a series of mailers and Robocalls to the Village.

34.    From April of 2018 thru the present these political Robocalls have exposed the public corruption of Pekau and Walsh.

35.    The Mayor of Orland Park has publically and privately Claimed to Trustee  Dodge, former Trustee  Carol Ruzich, Former Trustee Michael Carroll, Tinley Park  Mayor Jacob Vandenberg, Jack Craven, and the former Mayor of Palos Park Don  Jeannes  and in person to hundred's of supporters  including Thomas Larney, Chief of  Police Timothy McCarthy, Joseph Solek, Sean Kampus and in excess of 750 people who he emails and post different claim's  on his website and Facebook pages. In his public and private emails he has claimed that the following People have been responsible for these calls that have no date, time or number to

establish they occurred.

        A. Gerald Gorman
        B. Ray Hanania
        C. Liz Gorman
        D. Sean Morrison – Cook County Commissioner
        E. Kyle Hastings Mayor of Orland Hills
        F. Paul O'Grady- Orland Township Supervisor
        G. Dan McLaughlin – Former Mayor Of Orland Park
        H. The Cook County Democratic Party
        I. The Electricians Union Local 134
        J. State Senator Michael Hastings
        K. Carol Ruzich
        L. Michael Carroll
        M. Patricia Gira
        N. James Dodge
        O. Devin Hodge
        P. Kelly O'Brien
        Q. Kyle R Hastings II

36.    In December of 2019 Pekau attacked Plaintiff Michael Henry.

Plaintiff found articles on the Public Corruption of Pekau's father who was a

board member in the 1970s  for the Village of Orland Park and the articles

detailed Pekau 's Father seeking illegal campaign contributions from

Developers who were working on annexation and zoning  agreements with

the Village.

37.    The people of Orland Park Voted Pekau's Father Donald Pekau out of

Office for Public Corruption.

38.    The Village of Orland Park was plagued with longtime staff resigning and leaving as they did not want to be involved in the public corruption of Pekau and Walsh.

39.    The Village of Orland Park finally Hired a new Village Manager George  Koczwara on September 3, 2019 and he Started work During the Month of October.

40.    In December of 2019 Pekau and Walsh concocted a scheme to attack Plaintiff Henry by filing a lawsuit under the TCPA -  47 U.S. Code § 227 – Restrictions on  use of telephone equipment **.**

41.    The tale of Public Corruption and perjury and criminal Violations of US Law  continues.

42.    Attorney Howard Jablecki, Dennis Walsh and Keith Pekau instructed George Koczwara to commit perjury and sign an affidavit verifying a complaint that they  Filed in State Court.

43.    The fabricated lawsuit claims that Plaintiff Henry was responsible for

Illegal Robocalls from  April of 2018 through the present and George

Koczwara signed an affidavit under penalty of Perjury that he had

knowledge of and Verified the Cook County Filed Lawsuit.

44.    This court, Us Attorney John Lausch  and the Illinois Attorney

General were aware of all of this Public corruption and chose not to act and

allowed solicitation of Bribes by the Chief Judge,  Judge Murphy,  Michael

Madigan and the Cook County Democratic Party

Why did John Lausch Ignore Federal Law and Not prosecute Pekau and

Walsh and Jablecki.

45.    The biggest question to answer is if George Koczwara did not start

working for the Village of Orland Park  Till October of  2019 how did he

sign an affidavit under Penalty of Perjury that he had Firsthand  Knowledge

that All of these event occurred when the lawsuit states the events and

Robocalls started in  April 2018 a year  and a half before George Koczwara

Started working for the Village?

46.    The Public Corruption and Violation of Federal Law is rampant in
Orland Park.

47.     The Law firm of Klein Thorpe and Jenkins and Attorneys Dennis

Walsh and  Howard Jablecki set out on a course to violate State and Federal

Law and falsify Court  Filings.  They committed Legal Malpractice billing

fraud mail fraud and wire fraud 48 times and illegally billed in excess of 4

Million dollars to the Village of Orland Park

THE  LAW

48.     The Village of Orland Park has Ignored Federal  laws and filed

in the Circuit Court trying to make a claim not allowed by the Federal

Government or Statue.


49.     Attached as Exhibit I is the Lawsuit filed by  the Village and it's

Attorney in Civil and Criminal Violation of the laws of the United States.


The Undisputed Facts


50.      US Attorney John Lausch and Attorney General Kwame Raoul

were aware of the Bribery and Kick Backs in Orland Park and failed to stop

the corruption.

51.     US Attorney John Lausch and Attorney General Kwame Raoul

were aware that Cook County Judges are fixing cases and taking Illegal

Campaign Contributions  in effect selling rulings to the highest bidder.

52.    US Attorney John Lausch and Attorney General Kwame Raoul

were aware that Mayor Keith Pekau was instructing the Village Law Firm

to file bogus lawsuits costing the Taxpayers of Orland Park 250 thousand

dollars while providing Kick Backs to Keith Pekau in the amount of 21

thousand dollars.

53.    The Attorney General of the State of Illinois has failed to police

Corrupt Villages in the State of Illinois allowing illegal activity to flourish.

54.    The Attorney General of the State of Illinois has failed to prosecute

the public Corruption of Keith Pekau and George Koczwara, for illegal

activities.

55.    Attorney Jablecki was notified in May of 2021 that the United States

Supreme Court Defined what exactly was required by Federal Law to file

A lawsuit under the TCPA and was aware he had not met the pleading

requirements but had in fact under information and belief arraigned for

campaign donations to keep the lawsuit on the Court docket.

56.     At all times Attorney Jablecki Ignored the Illinois rules of

Professional  Conduct and failed to disclose to the Cook County Court that

the  Supreme Court ruling ended all of the claims.

57. The Village of Orland park at the instruction of Keith Pekau has not bid

the legal services as required by Illinois law.  It failed to have a board

meeting in over 5 years since Pekau was elected approving a no bid contract

and the year fees charged by Klein Thorpe and Jenkins.

58. In violation of Illinois law Klein Thorpe and Jenkins has increased its

hour rates without authorization and has committed mail and Billing fraud

68 times and John Lausch was aware of this and failed to prosecute.

### Temporary restraining Order against all Parties

57.     Mr. Henry incorporates by reference paragraphs 1 through 56 above

as if fully set here.

Wherefore Plaintiff Prays that the court reviews the Cook County Lawsuit at
it's face and recognize all of the defects and failure to plead and issue a
Temporary Restraining order against  all defendants from moving forward
with this lawsuit and it orders the court to follow the United states Supreme
court.

Further the Plaintiff request that a special prosecutor be appointed to  report
to this court on the public corruption and bribery solicitation by Cook
County judges

## COUNT II

### Permanent Injunction against all parties

58.     Mr. Henry incorporates by reference paragraphs 1 through 57 above as if fully set here.

Wherefore Plaintiff Prays that the court reviews the Cook County Lawsuit at it's face and recognize all of the defects and failure to plead and issue a permanent injunction against  all defendants from moving forward with this lawsuit and it orders the court to follow the United states Supreme court and dismiss the case with prejudice.

Further the Plaintiff request that a special prosecutor be appointed to  report to this court on the public corruption and bribery solicitation by Cook County judges

## COUNT III

59 Mr. Henry incorporates by reference paragraphs 1 through 58 above as if fully set here.

Wherefore Plaintiff prays that this court awards him the sum of 1 Million dollars against George Koczwara in the amount of 1 Million dollars for defamation of Character, Slander and fraudulent statements and affidavits

## COUNT IV

60.     Mr. Henry incorporates by reference paragraphs 1 through 59 above as if fully set here.

Wherefore Plaintiff Prays that this court awards him the sum of 1 Million dollars against Keith Pekau in the amount of 1 Million dollars for defamation of Character, Slander and fraudulent statements.

## COUNT V

61.     Mr. Henry incorporates by reference paragraphs 1 through 60 above as if fully set here.

Wherefore Plaintiff Prays that this court awards him the sum of 1 Million dollars against Dennis Walsh in the amount of 1 Million dollars for defamation of Character, Slander and fraudulent statements.

## **COUNT VI**

62.     Mr. Henry incorporates by reference paragraphs 1 through 61 above as if fully set here.

Wherefore Plaintiff Prays that this court awards him the sum of 1 Million dollars against Howard Jablecki in the amount of 1 Million dollars for defamation of Character, Slander and fraudulent statements.

## **COUNT VII**

18 U.S. Code CHAPTER 96— RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS Claim

62.     Mr. Henry incorporates by reference paragraphs 1 through 61 above as if fully set here.

Wherefore Plaintiff Prays that this court awards him and the Taxpayers of Orland Park Treble Damages for all of the Fraudulent Legal work in the amount of 275 thousand Dollars in actual fraud and triple it Jointly and severally  against Keith Pekau, Howard Jablecki, Dennis Walsh the sum of 1 Million dollars against Howard Jablecki in the amount of 1 Million dollars for defamation of Character, Slander and fraudulent statements.


## **COUNT VIII**

Billing Fraud and Legal Malpractice Count

63.     Mr. Henry incorporates by reference paragraphs 1 through 62 above as if fully set here.

Wherefore Plaintiff Prays that this court awards him and the Taxpayers of

Orland Park for damages for Legal Malpractice, billing fraud, mail fraud

and wire fraud 48 times and illegally billed in excess of 4 Million dollars to t

the Village of Orland Park and order the Law firm of Klein Thorpe and

Jenkins,  Keith Pekau Individually, Cindy Nelson Katsenes Individually,

Dennis Walsh Individually , Howard Jablecki Individually and George

Koczwara Individually to repay Michael Henry and the Taxpayers

of Orland Park 4 million dollars in actual damages and 10 million

dollars of Punitive damages.


/Michael F. Henry/
_____
Michael F. Henry
13233 Bundoran Court
Orland Park, Illinois 60462
Michaelfhenry@live.com

# EXHIBIT  I

Civil Action Cover Sheet

**(06/06/18) CCM 0520 A**

FILED
1/29/2020 3:54 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
20205000698

8275365

FILED DATE: 1/29/2020 3:54 PM    20205000698

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

## MUNICIPAL DEPARTMENT/ _____ FIFTH _____ DISTRICT

20205000698

THE VILLAGE OF ORLAND PARK, an Illinois municipal corporation

Plaintiff

v.

MICHAEL F. HENRY, and UNKNOWN DEFENDANTS,

Defendant

Case No. _____

Jury Demand    ○ Yes    ○ No

☐  I need language help in court.

I speak _____

## CIVIL ACTION COVER SHEET

A Civil Action Cover Sheet shall be filed with the complaint in all civil actions.  The information contained herein is for administrative purposes only and cannot be introduced into evidence.  Please check the box in front of the appropriate general category which best characterizes your action.

### Civil Case (A)

☐  0004  Tort not Personal Injury
☐  1004  Tort not Personal Injury (Jury)
☐  0007  Confession of Judgment
☐  1007  Confession of Judgment (Jury)
☐  0008  Replevin
☐  1008  Replevin (Jury)
☐  0017  Detinue
☐  1017  Detinue (Jury Demand)
☐  0031  Foreign Judgment
        Filing Out of State/Out of Country
☐  0054  Registration of Administrative Judgment

### Tort/Personal Injury Case

Any wrong or damage done to another person, such as, physical pain, illness, or any impairment of physical condition resulting from the careless or negligent actions of others.  The most common cases involve auto accident injuries.

☐  0027  Personal Injury Motor Vehicle
☐  1027  Personal Injury Motor Vehicle (Jury)
☐  0048  Dram Shop
☐  1048  Dram Shop (Jury)
☐  Product Liability
☐  0051  Personal Injury Subrogation
☐  1051  Personal Injury Subrogation (Jury)
☐  0057  Personal Injury Motor Vehicle Subrogation
☐  1057  Personal Injury Motor Vehicle Subrogation
        (Jury)
☐  0061  Personal Injury Other

☐  1061  Personal Injury Other (Jury)
☐  0063  Tort Intentional
☐  1063  Tort Intentional (Jury)
☐  0062  Property Damage
☐  1062  Property Damage (Jury)

### Other Litigation Case

(i.e. credit card agreements, any contract between two or more individuals)

☐  0002  Breach of Contract
☐  1002  Breach of Contract (Jury)
☐  0071  Fraud
☐  1071  Fraud (Jury)
☐  0072  Consumer Fraud
☐  1072  Consumer Fraud (Jury)
☐  0073  Breach of Warranty
☐  1073  Breach of Warranty (Jury)
☐  0074  Statutory Action Complaint
☐  1074  Statutory Action Complaint (Jury)

### Civil Case (B)

☐  Filing an Illinois Court Judgment
☐  0100  Petition for Discovery
        A Petition to take depositions or subpoena
        records before a case is filed.
☐  0009  Name Change (Suburban Districts only)

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**    cookcountyclerkofcourt.org

**Civil Action Cover Sheet**                                    **(06/06/18) CCM 0520 B**

FILED DATE: 1/29/2020 3:54 PM   20205000698

## Civil Housing Case

(i.e. condominium conversion, conservation, demolition/objection to fast track, exterior walls/facades, fire protection, heat call (including Unincorporated Cook County), lead paint new developments, public nuisance, public places of amusement, strategic task force inspections)

- ☐ 0038  Housing
- ☐ 1038  Housing (Jury)
- ☑ Ordinance Violation
- ☐ 0086  Objection to Fast Track
- ☐ 1086  Objection to Fast Track (Jury)
- ☐ 0044  Criminal Ordinance Violation
- ☐ 1044  Criminal Ordinance Violation (Jury)
- ☐ 0037  Heat Case
- ☐ 1037  Heat Case (Jury)
- ☐ 0034  Vacant Building
- ☐ 1034  Vacant Building (Jury)

## Pro Se Case Type (First Municipal Civil Division only)

The Pro Se Court section of the Civil Division resolves disputes between parties where the amount at issue does not exceed $5,000.  The party may act as their own attorney.  Forms can be completed at the Pro Se desk in Room 602.

- ☐ 0050  Pro Se ($5,000 or less)

## Eviction Case/Civil Eviction/CHA Eviction

A summary proceeding in which the landlord seeks to restore possession of the premises or payment of rent when the tenant has wrongfully withheld rent or possession of the premises.

- ☐ 0005  Eviction (possession only)
- ☐ 1005  Eviction (possession only) (Jury)
- ☐ 0006  Joint Action (possession and rent)
- ☐ 1006  Joint Action (possession and rent) (Jury)
- ☐ 0018  Distress for Rent
- ☐ 1018  Distress for Rent (Jury)
- ☐ 0023  Mortgage Foreclosure Eviction
- ☐ 1023  Mortgage Foreclosure Eviction (Jury)
- ☐ 0024  Mortgage Foreclosure Eviction - Joint Action
- ☐ 1024  Mortgage Foreclosure Eviction - Joint Action (Jury)
- ☐ 0021  CHA Eviction
- ☐ 1021  CHA Eviction (Jury)
- ☐ 0022  CHA Joint Action
- ☐ 1022  CHA Joint Action (Jury)

---

◉ Atty. No.: **90446**          ○ Pro Se 99500

Atty Name: **Howard C. Jablecki**

Atty. for: **Village of Orland Park**

Address: **20 N. Wacker Drive, Suite 1660**

City: **Chicago**          State: **IL**

Zip: **60631**

Telephone: **312.984.6400**

Primary Email: **hcjablecki@ktjlaw.com**

Pro Se Only:  ☐ I have read and agree to the terms of the Clerk's Office Electronic Notice Policy and choose to opt in to electronic notice from the Clerk's office for this case at this email address:

Email: _____

---

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois   cookcountyclerkofcourt.org**

FILED
1/29/2020 3:54 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
20205000698

FILED DATE: 1/29/2020 3:54 PM   20205000698

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## MUNICIPAL DEPARTMENT, FIFTH MUNICIPAL DISTRICT

| | |
|---|---|
| **THE VILLAGE OF ORLAND PARK,**<br>**an Illinois municipal corporation,**<br><br>*Plaintiff*,<br><br>v.<br><br>**MICHAEL F. HENRY, and UNKNOWN**<br>**DEFENDANTS,**<br><br>*Defendants*. | )<br>)<br>)<br>)<br>)<br>)   **Case No.  20205000698**<br>)<br>)<br>)<br>)<br>)<br>) |

## VERIFIED COMPLAINT
## FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff, the VILLAGE OF ORLAND PARK, an Illinois municipal corporation ("VILLAGE"), by and through its attorneys, KLEIN, THORPE AND JENKINS, LTD., complains of the Defendants as follows:

### NATURE OF THE CASE

1.      For the past several years, the Village and its residents have been inundated with by a scourge of vile, defamatory, and anonymous robocalls, all of which violate local, state and federal law.  These robobcalls constitute a nuisance to the community, a disturbance of the peace, and a breach of federal law. The residents of Orland Park have attended public meetings and have pleaded with the Village Board to do something about these robocalls.  Since many of these calls have identified individual residents and businesses, along with their telephone numbers, these residents have expressed concerns to their safety.

436112_1                                      1

FILED DATE: 1/29/2020 3:54 PM   2020S000698

**FACTS COMMON TO ALL COUNTS**

2.      Plaintiff, the Village of Orland Park (hereinafter the "Village"), is a home rule municipal corporation, incorporated under the laws of the State of Illinois, and located within Cook County, Illinois.

3.      Defendant, MICHAEL F. HENRY, is a resident of Orland Park, Cook County, Illinois, who upon information and belief resides at 13233 Bundoran Court, Orland Park, Illinois 60462.

4.      Upon information and belief, Defendant HENRY owns, operates or otherwise is involved with a robocall company, or is otherwise responsible or involved in the allegations contained herein.

5.      Upon information and belief, UNKNOWN DEFENDANTS own, operate or otherwise are involved with a robocall company, or are otherwise responsible or involved in the allegations contained herein.

6.      This proceeding is brought pursuant to various provisions of the Orland Park Village Code ("Code"), Title 6, Chapter 2, Section 6-2-2; Title 8, Chapter 6, Section 8-6-1-1; the Illinois Municipal Code, Chapter 65, Act 5 Section 11-60-2, 65 ILCS 5/11-60-2; and the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §227.

7.      From April 2018 through the filing of this Complaint, the Village has received a substantial number of complaints from Village residents regarding no less than thirty six illegal robocalls (the "Illegal Robocalls").

8.      These Village residents have contacted the Village via phone calls and emails as a result of the inaccurate, defamatory and harassing nature of these Illegal Robocalls, and have appeared at Village meetings to express their concerns about these Illegal Robocalls, the

436112_1                                      2

FILED DATE: 1/29/2020 3:54 PM   2020S0000698

disturbance of the peace caused by these Illegal Robocalls, and how these Illegal Robocalls greatly offend the public morals and decency.

9.      None of the Illegal Robocalls identify the individual responsible for initiating the call, nor do they state the phone number of the individual responsible for the call, both in violation of 47 C.F.R. §64.1200(b)(1) and (2).

10.      Defendant HENRY, upon information and belief, operates a robocall company.

11.      In addition, Defendant HENRY has submitted a substantial number of Freedom of Information Act Requests to the Village, seeking information that subsequently becomes the subject of an illegal robocall.

12.      After residents of the Village made public comments complaining about the Illegal Robocalls at the January 6, 2020 Village Board meeting, Defendant HENRY acknowledged he was the subject of those comments.

13.      Upon information and belief, UNKNOWN DEFENDANTS, are also responsible for or otherwise involved with the Illegal Robocalls.

## COUNT I - NUISANCE

1-13.   The Village hereby incorporates paragraphs 1-13 of the facts common to all counts as if fully set forth in this CountI.

14.      Section 11-60-2 of the Illinois Municipal Code, 65 ILCS 5/11-60-2, provides the Village with the authority to define, prevent, and abate nuisances.

15.      Title 6, Chapter 2, Section 6-2-2 of the Village Code provides: "It shall be a public nuisance and shall constitute a violation of this Municipal Code to commit any offense…which is in fact a nuisance according to the common law, other ordinances of the Village, or the statutes of the State of Illinois, or the statutes of the United States or which

436112_1                                      3

FILED DATE: 1/29/2020 3:54 PM   20205000698

deleteriously affects the public health, welfare, or safety or greatly offends the public morals or decency."

16.     The Illegal Robocalls detailed above constitute a public nuisance in violation of Title 6, Chapter 2, Section 6-2-2 of the Village Code.

17.     The Illegal Robocalls are in violation of federal law, deleteriously affect the public health, welfare and safety, and greatly offend the public morals or decency, as evidence by the complaints received from and statements made by Village residents.

18.     The illegal nature of the Illegal Robocalls, in that they fail to identify the individual calling or a phone number where that individual can be reached, is a continuing public nuisance that is capable of being remedied and abated.

19.     Defendant HENRY and UNKNOWN DEFENDANTS are responsible for this public nuisance pursuant to Village Code.

20.     Pursuant to Section 6-2-3 of the Village Code, Defendants are liable and responsible for all costs and expenses relating to, or associated with, the abatement of this nuisance.

21.     This Court has the power and authority to fashion a remedy that will offer relief to the Village for all costs which it incurs or may incur in relation to, or in association with, the abatement of this nuisance.

22.     The Illegal Robocalls constitute a continuing and ongoing violation of the Village Code.

23.     The levying of a fine is not an adequate remedy for the public nuisance presented by the Illegal Robocalls.  As such it is necessary that an injunction (both preliminary and permanent injunction) be issued to ensure the Defendants comply with Village Code.

436112_1                                              4

FILED DATE: 1/29/2020 3:54 PM   20205000698

24.     The Village has a likelihood of success on the merits.

25.     The Village and its residents will continue to suffer irreparable harm if the Illegal Robocalls are permitted to continue.

26.     There is no adequate remedy at law to abate the public nuisance.,

**WHEREFORE,** Plaintiff, the Village of Orland Park, respectfully requests that this Court enter an Order finding the following:

A.     That the Illegal Robocalls detailed in this Complaint constitute a continuing nuisance; and

B.     That the Court enter a permanent injunction prohibiting the Defendants from continuing to engage in the Illegal Robocalls; and

C.     That the Court order that the necessary costs and expenses of abating the nuisances as set forth above be found and charged against the Defendants, and grant a judgment against Defendants for such amount; and

D.     For reasonable attorneys' fees, court costs, and other expenses relating to, or associated with, the Village's enforcement of the Illinois Municipal Code and the Orland Park Village Code in relation to this litigation; and

E.     For such further relief as the Court deems just and necessary.

## COUNT II – COMMON LAW NUISANCE

1-26.   Plaintiff re-alleges and incorporates the allegations of paragraphs 1 through 26 of Count I as paragraphs 1 through 26 of Count II of its Complaint.

27.     The Code violations set forth above and presented by the Illegal Robocalls constitute continuing violations of the Village Code and public nuisances.

436112_1

28.     Public peace, public comfort, and the quiet enjoyment of one's property are public rights, and citizens have a public right to be free from the substantial annoyance and inconvenience resulting from excessive, offensive Illegal Robocalls.

29.     The Defendants' violations set forth above are proscribed by the Village Code, are continuing in nature, and involve a significant and unreasonable interference with the public peace, public comfort and the quiet enjoyment of one's property.

30.     The Defendants' acts or omissions are the proximate cause of the public nuisance.

31.     Residents of the Village and the general public have suffered damages from Defendants' actions in that they have been deprived of public peace, public comfort, and the quiet enjoyment of property due to the substantial annoyance and inconvenience from excessive, offensive Illegal Robocalls.

32.     In addition, the Village has spent considerable time and resources responding to and addressing the numerous complaints about the Illegal Robocalls.

33.     The Illegal Robocalls constitute a continuing public nuisance and are capable of being remedied and abated.

34.     Defendants are liable and responsible for all costs and expenses relating to, or associated with, the abatement of this nuisance.

35.     This Court has the power and authority to fashion a remedy that will offer relief to the Village for all costs which it incurs or may incur in relation to, or in association with, the abatement of this nuisance.

36.     A public nuisance is remediable by injunction or a suit for damages.

37.     The levying of a fine is not an adequate remedy for the abatement of the nuisance presented by the Illegal Robocalls.  As such, it is necessary that an injunction (both a preliminary

FILED DATE: 1/29/2020 3:54 PM   2020500006698

and permanent injunction) be issued in order to ensure that Defendants cease violation of the Village Code.

38.     The Village is acting as a private attorney general in protecting the public and is entitled to attorneys' fees and litigation costs in this action because it is protecting the public health, safety, and welfare by pursuing this action.

 **WHEREFORE**, Plaintiff, VILLAGE OF ORLAND PARK, respectfully requests that this Court:

A.     Issue a temporary and permanent injunction prohibiting the Defendants from engaging in Illegal Robocalls, thereby creating a nuisance; and

B.     Grant a judgment against Defendants for all costs and expenses, including attorneys fee, relating to, or associated with, the  Village's enforcement of the Illinois Municipal Code and the Village Code in relation to this litigation; and

D.     For such other and further relief as the Court deems just and necessary in the circumstances.

## COUNT III – ORDINANCE VIOLATION (DISORDERLY CONDUCT)

1-38.   Plaintiff re-alleges and incorporates the allegations of paragraphs 1 through 38 of Count II as paragraphs 1 through 38 of Count III of its Complaint.

39.     Section 8-6-1-1 of the Village Code sets forth the following offenses of Disorderly Conduct:

a. In an unreasonable manner to make, aid, countenance or assist in making any improper voice, riot, disturbance, breach of the peace or diversion tending to a breach of the peace in the streets or elsewhere in the Village.

b.  To make or cause to be made any obscene phone calls.

FILED DATE: 1/29/2020 3:54 PM   2020500000698

c. To do any act in such an unreasonable manner as to alarm or disturb another and to provoke a breach of the peace.

40.    The acts of the Defendants in making or otherwise being involved in or responsible for the Illegal Robocalls, are unreasonable and obscene given their violation of Federal Law, and disturb the residents of the Village as evidenced by the numerous complaints received by the Village.

41.    Fines for violations of Section 8-6-1-1 of the Village Code range from a minimum of $250 per offense to a maximum of $1,000 per offense.

**WHEREFORE**, Plaintiff, VILLAGE OF ORLAND PARK, respectfully requests that this Court:

A. Find the Defendants conduct constitutes disorderly conduct under the Village Code;

B. Fine the Defendants $1,000 per offense for each and every Illegal Robocall; and

C. For such other and further relief as the Court deems just and necessary in the circumstances.

## COUNT IV – VIOLATION OF THE TCPA

1-41.    Plaintiff re-alleges and incorporates the allegations of paragraphs 1 through 41 of Count III as paragraphs 1 through 41 of Count IV of its Complaint.

42.    The TCPA provides for a cause of action against any person responsible for robocalls that violate the regulations related to the TCPA.  47 U.S.C. §227(c)(5)(A).

43.    The Illegal Robocalls fail to identify the individual responsible for initiating the call and fail to state the phone number of the individual responsible for the call, in violation of 47 C.F.R. §64.1200(b)(1) and (2).

FILED DATE: 1/29/2020 3:54 PM  2020S000698

FILED DATE: 1/29/2020 3:54 PM   2020SO000698

44.     The TCPA provides for damages of $500 for every violation, with the willful and knowing violations subject to three times that amount.

**WHEREFORE**, Plaintiff, VILLAGE OF ORLAND PARK, respectfully requests that this Court:

A.  Find the Defendants have violated the TCPA;

B.  Fine the Defendants $1500 for each and every Illegal Robocall given Defendants knowing and intentional violation of the TCPA; and

C.  For such other and further relief as the Court deems just and necessary in the circumstances.

VILLAGE OF ORLAND PARK

By: /s/ Howard C. Jablecki
                One of its Attorneys

Dennis G. Walsh
Howard C. Jablecki
KLEIN, THORPE AND JENKINS, LTD.
20 N. Wacker Drive, Suite 1660
Chicago, Illinois 60606
(312)984-6400
Firm No. 90446
hcjablecki@ktjlaw.com
dgwalsh@ktjlaw.com

436112_1                                  9

FILED DATE: 1/29/2020 3:54 PM   20205000698

STATE OF ILLINOIS         )
                          )      SS.
COUNTY OF COOK            )

### VERIFICATION

I, George Koczwara, Village Manager of the Village of Orland Park, Illinois being first duly sworn on oath state that I have read the above and foregoing Verified Complaint for Injunctive and Other Relief, and have knowledge of the contents thereof, and that the matters set forth therein are true and correct in substance and in fact.

George Koczwara
Village Manager

SUBSCRIBED AND SWORN TO
before me this 3rd day of February, 2020

Notary Public

"OFFICIAL SEAL"
Alexandra Snodsmith
NOTARY PUBLIC, STATE OF ILLINOIS
My Commission Expires July 12, 2022

435789_1

10

# EXHIBIT  II

(Slip Opinion)          OCTOBER TERM, 2020          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FACEBOOK, INC. *v.* DUGUID ET AL.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 19–511.  Argued December 8, 2020—Decided April 1, 2021

The Telephone Consumer Protection Act of 1991 (TCPA) proscribes abusive telemarketing practices by, among other things, restricting certain communications made with an "automatic telephone dialing system." The TCPA defines such "autodialers" as equipment with the capacity both "to store or produce telephone numbers to be called, using a random or sequential number generator," and to dial those numbers. 47 U. S. C. §227(a)(1). Petitioner Facebook, Inc., maintains a social media platform that, as a security feature, allows users to elect to receive text messages when someone attempts to log in to the user's account from a new device or browser. Facebook sent such texts to Noah Duguid, alerting him to login activity on a Facebook account linked to his telephone number, but Duguid never created that account (or any account on Facebook). Duguid tried without success to stop the unwanted messages, and eventually brought a putative class action against Facebook. He alleged that Facebook violated the TCPA by maintaining a database that stored phone numbers and programming its equipment to send automated text messages. Facebook countered that the TCPA does not apply because the technology it used to text Duguid did not use a "random or sequential number generator." The Ninth Circuit disagreed, holding that §227(a)(1) applies to a notification system like Facebook's that has the capacity to dial automatically stored numbers.

*Held*: To qualify as an "automatic telephone dialing system" under the TCPA, a device must have the capacity either to store a telephone number using a random or sequential number generator, or to produce a telephone number using a random or sequential number generator. Pp. 4–12.

2                     FACEBOOK, INC. *v.* DUGUID

Syllabus

(a) This case turns on whether the clause "using a random or sequential number generator" in §227(a)(1)(A) modifies both of the two verbs that precede it ("store" and "produce"), as Facebook contends, or only the closest one ("produce"), as maintained by Duguid. The most natural reading of the text and other aspects of §227(a)(1)(A) confirm Facebook's view. First, in an ordinary case, the "series-qualifier canon" instructs that a modifier at the end of a series of nouns or verbs applies to the entire series. Here, that canon indicates that the modifying phrase "using a random or sequential number generator" qualifies both antecedent verbs, "store" and "produce." Second, the modifying phrase immediately follows a concise, integrated clause ("store or produce telephone numbers to be called"), which uses the word "or" to connect two verbs that share a common direct object ("telephone numbers to be called"). Given this structure, it would be odd to apply the modifier to just one part of the cohesive clause. Third, the comma in §227(a)(1)(A) separating the modifying phrase from the antecedents suggests that the qualifier applies to all of the antecedents, instead of just the nearest one. Pp. 4–6.

Duguid's insistence that a limiting clause should ordinarily be read as modifying only the phrase that it immediately follows (the so-called "rule of the last antecedent") does not help his cause for two reasons. First, the Court has declined to apply that rule in the specific context where, as here, the modifying clause appears after an integrated list. *Jama* v. *Immigration and Customs Enforcement*, 543 U. S. 335, 344, n. 4. Second, the last antecedent before the clause at issue in §227(a)(1)(A) is not "produce," as Duguid argues, but rather "telephone numbers to be called." Pp. 6–7.

(b) The statutory context confirms that the TCPA's autodialer definition excludes equipment that does not use a random or sequential number generator. Congress found autodialer technology harmful because autodialers can dial emergency lines randomly or tie up all of the sequentially numbered phone lines at a single entity. Facebook's interpretation of §227(a)(1)(A) better matches the scope of the TCPA to these specific concerns. Duguid's interpretation, on the other hand, would encompass any equipment that stores and dials telephone numbers. Pp. 7–8.

(c) Duguid's other counterarguments do not overcome the clear commands of the statute's text and broader context. First, he claims that his interpretation best accords with the "sense" of the text. It would make little sense however, to classify as autodialers all equipment with the capacity to store and dial telephone numbers, including virtually all modern cell phones. Second, Duguid invokes the "distributive canon," which provides that a series of antecedents and consequents should be distributed to one another based on how they most

Syllabus

naturally relate in context.  But that canon is less suited here because there is only one consequent to match to two antecedents, and in any event, the modifying phrase naturally relates to both antecedents. Third, Duguid broadly construes the TCPA's privacy-protection goals. But despite Congress' general concern about intrusive telemarketing practices, Congress ultimately chose a precise autodialer definition. Finally, Duguid argues that a random or sequential number generator is a "senescent technology," *i.e.,* one likely to become outdated quickly. That may or may not be the case, but either way, this Court cannot rewrite the TCPA to update it for modern technology.  Congress' chosen definition of an autodialer requires that the equipment in question must use a random or sequential number generator.  That definition excludes equipment like Facebook's login notification system, which does not use such technology.  Pp. 8–11.

926 F. 3d 1146, reversed and remanded.

SOTOMAYOR, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, BREYER, KAGAN, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined.  ALITO, J., filed an opinion concurring in the judgment.

Cite as: 592 U. S. ____ (2021)          1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports.  Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order that
corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 19–511

_____

## FACEBOOK, INC., PETITIONER *v.* NOAH DUGUID, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[April 1, 2021]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

The Telephone Consumer Protection Act of 1991 (TCPA) proscribes abusive telemarketing practices by, among other things, imposing restrictions on making calls with an "automatic telephone dialing system."  As defined by the TCPA, an "automatic telephone dialing system" is a piece of equipment with the capacity both "to store or produce telephone numbers to be called, using a random or sequential number generator," and to dial those numbers.  47 U. S. C. §227(a)(1).  The question before the Court is whether that definition encompasses equipment that can "store" and dial telephone numbers, even if the device does not "us[e] a random or sequential number generator."  It does not.  To qualify as an "automatic telephone dialing system," a device must have the capacity either to store a telephone number using a random or sequential generator or to produce a telephone number using a random or sequential number generator.

## I

## A

In 1991, Congress passed the TCPA to address "the pro-liferation of intrusive, nuisance calls" to consumers and businesses from telemarketers. §2, ¶¶1, 6, 105 Stat. 2394, note following 47 U. S. C. §227.  Advances in automated technology made it feasible for companies to execute large-scale telemarketing campaigns at a fraction of the prior cost, dramatically increasing customer contacts.  Infa-mously, the development of "robocall" technology allowed companies to make calls using artificial or prerecorded voices, obviating the need for live human callers altogether.

This case concerns "automatic telephone dialing systems" (hereinafter autodialers), which revolutionized telemarket-ing by allowing companies to dial random or sequential blocks of telephone numbers automatically.  Congress found autodialer technology to be uniquely harmful.  It threatened public safety by "seizing the telephone lines of public emergency services, dangerously preventing those lines from being utilized to receive calls from those needing emergency services." H. R. Rep. No. 102–317, p. 24 (1991). Indeed, due to the sequential manner in which they could generate numbers, autodialers could simultaneously tie up all the lines of any business with sequentially numbered phone lines.  Nor were individual consumers spared: Auto-dialers could reach cell phones, pagers, and unlisted num-bers, inconveniencing consumers and imposing unwanted fees.[1] *Ibid.*

Against this technological backdrop, Congress made it unlawful to make certain calls "using any automatic tele-phone dialing system" to "emergency telephone line[s]," to

_____

[1] At the time Congress enacted the TCPA, most cellular providers charged users not only for outgoing calls but also for incoming calls.  See *In re Rules and Regulations Implementing Telephone Consumer Protec-tion Act of 1991*, 18 FCC Rcd. 14014, 14115 (2003).

Opinion of the Court

"guest room[s] or patient room[s] of a hospital," or "to any telephone number assigned to a paging service [or] cellular telephone service" without the "prior express consent of the called party." 47 U. S. C. §227(b)(1)(A).[2] The TCPA creates a private right of action for persons to sue to enjoin unlawful uses of autodialers and to recover up to $1,500 per violation or three times the plaintiffs' actual monetary losses. §227(b)(3).

## B

Petitioner Facebook, Inc., maintains a social media platform with an optional security feature that sends users "login notification" text messages when an attempt is made to access their Facebook account from an unknown device or browser. If necessary, the user can then log into Facebook and take action to secure the account. To opt in to this service, the user must provide and verify a cell phone number to which Facebook can send messages.

In 2014, respondent Noah Duguid received several login-notification text messages from Facebook, alerting him that someone had attempted to access the Facebook account associated with his phone number from an unknown browser. But Duguid has never had a Facebook account and never gave Facebook his phone number.[3] Unable to stop the notifications, Duguid brought a putative class action against Facebook. He alleged that Facebook violated the TCPA by maintaining a database that stored phone numbers and programming its equipment to send automated text messages to those numbers each time the associated account was accessed by an unrecognized device or web browser.

———————

[2] Neither party disputes that the TCPA's prohibition also extends to sending unsolicited text messages. See *Campbell-Ewald Co.* v. *Gomez*, 577 U. S. 153, 156 (2016). We therefore assume that it does without considering or resolving that issue.

[3] As Facebook explains, it is possible that Duguid was assigned a recycled cell phone number that previously belonged to a Facebook user who opted to receive login notifications.

Facebook moved to dismiss the suit, arguing primarily that Duguid failed to allege that Facebook used an autodialer because he did not claim Facebook sent text messages to numbers that were randomly or sequentially generated. Rather, Facebook argued, Duguid alleged that Facebook sent targeted, individualized texts to numbers linked to specific accounts. The U. S. District Court for the Northern District of California agreed and dismissed Duguid's amended complaint with prejudice. 2017 WL 635117, *4–*5 (Feb. 16, 2017).

The United States Court of Appeals for the Ninth Circuit reversed. As relevant here, the Ninth Circuit held that Duguid had stated a claim under the TCPA by alleging that Facebook's notification system automatically dialed stored numbers. An autodialer, the Court of Appeals held, need not be able to use a random or sequential generator to store numbers; it need only have the capacity to "'store numbers to be called'" and "'to dial such numbers automatically.'" 926 F. 3d 1146, 1151 (2019) (quoting *Marks* v. *Crunch San Diego, LLC*, 904 F. 3d 1041, 1053 (CA9 2018)).

We granted certiorari to resolve a conflict among the Courts of Appeals regarding whether an autodialer must have the capacity to generate random or sequential phone numbers.[4] 591 U. S. ___ (2020). We now reverse the Ninth Circuit's judgment.

## II

Section 227(a)(1) defines an autodialer as:

"equipment which has the capacity—

———————

[4] Compare 926 F. 3d 1146, 1151–1152 (CA9 2019); *Duran* v. *La Boom Disco, Inc.*, 955 F. 3d 279, 290 (CA2 2020); and *Allan* v. *Pennsylvania Higher Educ. Assistance Agency*, 968 F. 3d 567, 579–580 (CA6 2020), with *Gadelhak* v. *AT&T Servs., Inc.*, 950 F. 3d 458, 468 (CA7 2020) (Barrett, J., for the court); *Glasser* v. *Hilton Grand Vacations Co.*, 948 F. 3d 1301, 1306–1307 (CA11 2020); and *Dominguez* v. *Yahoo, Inc.*, 894 F. 3d 116, 119 (CA3 2018).

Opinion of the Court

> "(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and
>
> "(B) to dial such numbers."

Facebook argues the clause "using a random or sequential number generator" modifies both verbs that precede it ("store" and "produce"), while Duguid contends it modifies only the closest one ("produce"). We conclude that the clause modifies both, specifying how the equipment must either "store" or "produce" telephone numbers. Because Facebook's notification system neither stores nor produces numbers "using a random or sequential number generator," it is not an autodialer.

## A

We begin with the text. Congress defined an autodialer in terms of what it must do ("store or produce telephone numbers to be called") and how it must do it ("using a random or sequential number generator"). The definition uses a familiar structure: a list of verbs followed by a modifying clause. Under conventional rules of grammar, "[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series," a modifier at the end of the list "normally applies to the entire series." A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 147 (2012) (Scalia & Garner) (quotation modified). The Court often applies this interpretive rule, usually referred to as the "series-qualifier canon." See *Paroline* v. *United States*, 572 U. S. 434, 447 (2014) (citing *Porto Rico Railway, Light & Power Co.* v. *Mor*, 253 U. S. 345, 348 (1920)); see also *United States* v. *Bass*, 404 U. S. 336, 339–340 (1971). This canon generally reflects the most natural reading of a sentence. Imagine if a teacher announced that "students must not complete or check any homework to be turned in for a grade, using online homework-help websites." It would be strange to read that rule as prohibiting

students from completing homework altogether, with or without online support.

Here, the series-qualifier canon recommends qualifying both antecedent verbs, "store" and "produce," with the phrase "using a random or sequential number generator." That recommendation produces the most natural construction, as confirmed by other aspects of §227(a)(1)(A)'s text.

To begin, the modifier at issue immediately follows a concise, integrated clause: "store or produce telephone numbers to be called." See *Cyan, Inc.* v. *Beaver County Employees Retirement Fund*, 583 U. S. ___, ___–___ (2018) (slip op., at 21–22). The clause "hangs together as a unified whole," *id.,* at ___ (slip op., at 21), using the word "or" to connect two verbs that share a common direct object, "telephone numbers to be called." It would be odd to apply the modifier ("using a random or sequential number generator") to only a portion of this cohesive preceding clause.

This interpretation of §227(a)(1)(A) also "heed[s] the commands of its punctuation." *United States Nat. Bank of Ore.* v. *Independent Ins. Agents of America, Inc.*, 508 U. S. 439, 454 (1993). Recall that the phrase "using a random or sequential number generator" follows a comma placed after the phrase "store or produce telephone numbers to be called." As several leading treatises explain, "'[a] qualifying phrase separated from antecedents by a comma is evidence that the qualifier is supposed to apply to all the antecedents instead of only to the immediately preceding one.'" W. Eskridge, Interpreting Law: A Primer on How To Read Statutes and the Constitution 67–68 (2016); see also 2A N. Singer & S. Singer, Sutherland Statutes and Statutory Construction §47:33, pp. 499–500 (rev. 7th ed. 2014); Scalia & Garner 161–162. The comma in §227(a)(1)(A) thus further suggests that Congress intended the phrase "using a random or sequential number generator" to apply equally to both preceding elements.

Contrary to Duguid's view, this interpretation does not

Opinion of the Court

conflict with the so-called "rule of the last antecedent." Under that rule, "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Barnhart* v. *Thomas*, 540 U. S. 20, 26 (2003); see also *Lockhart* v. *United States*, 577 U. S. 347, 351 (2016). The rule of the last antecedent is context dependent. This Court has declined to apply the rule where, like here, the modifying clause appears after an integrated list. See *Jama* v. *Immigration and Customs Enforcement*, 543 U. S. 335, 344, n. 4 (2005) (collecting cases). Moreover, even if the rule of the last antecedent were relevant here, it would provide no help to Duguid. The last antecedent before "using a random or sequential number generator" is not "produce," as Duguid needs it to be, but rather "telephone numbers to be called." There is "no grammatical basis," *Cyan*, 583 U. S., at ___ (slip op., at 22), for arbitrarily stretching the modifier back to include "produce," but not so far back as to include "store."

In sum, Congress' definition of an autodialer requires that in all cases, whether storing or producing numbers to be called, the equipment in question must use a random or sequential number generator. This definition excludes equipment like Facebook's login notification system, which does not use such technology.[5]

––––––––––

[5] JUSTICE ALITO notes that he "agree[s] with much of the Court's analysis," as well as its ultimate conclusion about the interpretive question before us, yet he concurs in the judgment only. *Post,* at 1. His apprehension appears to stem from what he sees as the Court's "heavy reliance" on the series-qualifier canon. *Ibid.* Such canons, he argues, are "not inflexible rules." *Post,* at 4. On that point, we agree: Linguistic canons are tools of statutory interpretation whose usefulness depends on the particular statutory text and context at issue. That may be all JUSTICE ALITO seeks to prove with his discussion and list of "sentences that clearly go against the canon," *post,* at 3. (That the grammatical structure of every example he provides is materially dissimilar from that of the clause at issue in this case proves the point.) But to the extent that he

Opinion of the Court

### B

The statutory context confirms that the autodialer definition excludes equipment that does not "us[e] a random or sequential number generator." 47 U. S. C. §227(a)(1)(A). Consider the TCPA's restrictions on the use of autodialers. As previously noted, §227(b)(1) makes it unlawful to use an autodialer to call certain "emergency telephone line[s]" and lines "for which the called party is charged for the call." §227(b)(1)(A). It also makes it unlawful to use an autodialer "in such a way that two or more telephone lines of a multiline business are engaged simultaneously." §227(b)(1)(D). These prohibitions target a unique type of telemarketing equipment that risks dialing emergency lines randomly or tying up all the sequentially numbered lines at a single entity.

Expanding the definition of an autodialer to encompass any equipment that merely stores and dials telephone numbers would take a chainsaw to these nuanced problems when Congress meant to use a scalpel. Duguid's interpretation of an autodialer would capture virtually all modern cell phones, which have the capacity to "store . . . telephone numbers to be called" and "dial such numbers." §227(a)(1). The TCPA's liability provisions, then, could affect ordinary cell phone owners in the course of commonplace usage, such as speed dialing or sending automated text message responses. See §227(b)(3) (authorizing a $500 fine per violation, increased to $1,500 if the sender acted "willfully" or

---

suggests that such canons have no role to play in statutory interpretation, or that resolving difficult interpretive questions is a simple matter of applying the "common understanding" of those "familiar with the English language," *post,* at 2–3, we disagree. Difficult ambiguities in statutory text will inevitably arise, despite the best efforts of legislators writing in "English prose," *post,* at 4. Courts should approach these interpretive problems methodically, using traditional tools of statutory interpretation, in order to confirm their assumptions about the "common understanding" of words.

Opinion of the Court

"knowingly").[6]

## III

Duguid's counterarguments cannot overcome the clear commands of §227(a)(1)(A)'s text and the statutory context. The crux of Duguid's argument is that the autodialer definition calls for a construction that accords with the "sense" of the text.  Brief for Respondents 11, and n. 3.  It makes the most "sense," Duguid insists, to apply the phrase "using a random or sequential number generator" to modify only "produce," which, unlike the verb "store," is closely connected to the noun "generator."  Dictionary definitions of "generator," for instance, regularly include the word "produce," which carries a very different meaning than "store." Duguid also claims that, at the time of the TCPA's enactment, the technical meaning of a "random number generator" invoked ways of producing numbers, not means of storing them.

Perhaps Duguid's interpretive approach would have some appeal if applying the traditional tools of interpretation led to a "linguistically impossible" or contextually implausible outcome.  *Encino Motorcars, LLC* v. *Navarro*, 584 U. S. ___, ___ (2018) (slip op., at 8); see also *Advocate Health Care Network* v. *Stapleton*, 581 U. S. ___, ___ (2017) (slip op., at 11) (noting that a "sense of inconceivability" might "urg[e] readers to discard usual rules of interpreting text"). Duguid makes a valiant effort to prove as much, but ulti-

_____

[6] Duguid contends that ordinary cell phones are not autodialers under his interpretation because they cannot dial phone numbers automatically and instead rely on human intervention.  But all devices require some human intervention, whether it takes the form of programming a cell phone to respond automatically to texts received while in "do not disturb" mode or commanding a computer program to produce and dial phone numbers at random.  We decline to interpret the TCPA as requiring such a difficult line-drawing exercise around how much automation is too much.

Opinion of the Court

mately comes up short.  It is true that, as a matter of ordi-
nary parlance, it is odd to say that a piece of equipment
"stores" numbers using a random number "generator."  But
it is less odd as a technical matter.  Indeed, as early as 1988,
the U. S. Patent and Trademark Office issued patents for
devices that used a random number generator to store num-
bers to be called later (as opposed to using a number gener-
ator for immediate dialing).[7]  Brief for Professional Associ-
ation for Customer Engagement et al. as *Amici Curiae* 15–
21.  At any rate, Duguid's interpretation is contrary to the
ordinary reading of the text and, by classifying almost all
modern cell phones as autodialers, would produce an out-
come that makes even less sense.

   Duguid's reliance on the distributive canon fails for simi-
lar reasons.  That canon provides that "[w]here a sentence
contains several antecedents and several consequents,"
courts should "read them distributively and apply the
words to the subjects which, by context, they seem most
properly to relate."  2A Singer, Sutherland Statutes and
Statutory Construction §47:26, at 448.  Set aside for a mo-
ment that the canon's relevance is highly questionable
given there are two antecedents (store and produce) but
only one consequent modifier (using a random or sequential

_____

   [7] Duguid argues that such a device would necessarily "produce" num-
bers using the same generator technology, meaning "store or" in
§227(a)(1)(A) is superfluous.  "It is no superfluity," however, for Congress
to include both functions in the autodialer definition so as to clarify the
domain of prohibited devices.  *BFP* v. *Resolution Trust Corporation*, 511
U. S. 531, 544, n. 7 (1994).  For instance, an autodialer might use a ran-
dom number generator to determine the order in which to pick phone
numbers from a preproduced list.  It would then store those numbers to
be dialed at a later time.  See Brief for Professional Association for Cus-
tomer Engagement et al. as *Amici Curiae* 19.  In any event, even if the
storing and producing functions often merge, Congress may have "em-
ployed a belt and suspenders approach" in writing the statute.  *Atlantic
Richfield Co.* v. *Christian*, 590 U. S. ___, ___, n. 5 (2020) (slip op., at 10,
n. 5).

Opinion of the Court

number generator).  See *Encino Motorcars*, 584 U. S., at ___ (slip op., at 8) ("[T]he distributive canon has the most force when the statute allows for one-to-one matching").  As just explained, the consequent "using a random or sequential number generator" properly relates to both antecedents.

Duguid next turns to legislative purpose, but he merely gestures at Congress' "broad privacy-protection goals." Brief for Respondents 28 (emphasizing that Congress prohibited calls made using an autodialer without "'prior express consent of the called party'" (quoting 47 U. S. C. §227(b)(1)(A))).  That Congress was broadly concerned about intrusive telemarketing practices, however, does not mean it adopted a broad autodialer definition.  Congress expressly found that the use of random or sequential number generator technology caused unique problems for business, emergency, and cellular lines.  See *supra,* at 2.  Unsurprisingly, then, the autodialer definition Congress employed includes only devices that use such technology, and the autodialer prohibitions target calls made to such lines.  See §227(b)(1)(A).[8]  The narrow statutory design, therefore, does not support Duguid's broad interpretation.

Duguid last warns that accepting Facebook's interpretation will "unleash" a "torrent of robocalls."  Brief for Respondents 38 (quotation modified).  As Duguid sees it, the thrust of congressional action since the TCPA's enactment has been to restrict nuisance calls.  Because technology "adapt[s] to change," Duguid argues, the TCPA must be treated as an "'agile tool.'"  *Id.,* at 38, 41.  To this end, Duguid asks this Court to focus not on whether a device has the "senescent technology," *id.,* at 41, of random or sequential number generation but instead on whether it has the "capacity to dial numbers without human intervention," *id.,*

---

[8] By contrast, Congress did impose broader prohibitions elsewhere in the TCPA.  See, *e.g.,* 47 U. S. C. §§227(b)(1)(A) and (B) (prohibiting "artificial or prerecorded voice" calls, irrespective of the type of technology used).

12              FACEBOOK, INC. *v.* DUGUID

Opinion of the Court

at 39 (internal quotation marks omitted).

To begin with, Duguid greatly overstates the effects of accepting Facebook's interpretation.  The statute separately prohibits calls using "an artificial or prerecorded voice" to various types of phone lines, including home phones and cell phones, unless an exception applies.  See 47 U. S. C. §§227(b)(1)(A) and (B).  Our decision does not affect that prohibition.  In any event, Duguid's quarrel is with Congress, which did not define an autodialer as malleably as he would have liked.  "Senescent" as a number generator (and perhaps the TCPA itself) may be, that is no justification for eschewing the best reading of §227(a)(1)(A).  This Court must interpret what Congress wrote, which is that "using a random or sequential number generator" modifies both "store" and "produce."

*       *       *

We hold that a necessary feature of an autodialer under §227(a)(1)(A) is the capacity to use a random or sequential number generator to either store or produce phone numbers to be called.  The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Cite as: 592 U. S. \_\_\_\_ (2021)  1

ALITO, J., concurring in judgment

# SUPREME COURT OF THE UNITED STATES

_____

No. 19–511

_____

## FACEBOOK, INC., PETITIONER *v.*
## NOAH DUGUID, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[April 1, 2021]

JUSTICE ALITO, concurring in the judgment.

I agree with the Court that an "automatic telephone dialing system," as defined in the Telephone Consumer Protection Act of 1991, must have the capacity to "store . . . telephone numbers" by "using a random or sequential number generator." 47 U. S. C. §227(a)(1)(A). I also agree with much of the Court's analysis and the analysis in several Court of Appeals decisions on this question. See *Gadelhak* v. *AT&T Servs., Inc.*, 950 F. 3d 458, 463–468 (CA7 2020); *Glasser* v. *Hilton Grand Vacations Co.*, 948 F. 3d 1301, 1306–1312 (CA11 2020).

I write separately to address the Court's heavy reliance on one of the canons of interpretation that have come to play a prominent role in our statutory interpretation cases. Cataloged in a treatise written by our former colleague Antonin Scalia and Bryan A. Garner, counsel for respondents in this case, these canons are useful tools, but it is important to keep their limitations in mind. This may be especially true with respect to the particular canon at issue here, the "series-qualifier" canon.

According to the majority's recitation of this canon, "'[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series,' a modifier at the end of the list 'normally applies to the entire series.'" *Ante*, at 5 (quoting A. Scalia & B. Garner, Reading Law: The

2               FACEBOOK, INC. *v.* DUGUID

ALITO, J., concurring in judgment

Interpretation of Legal Texts 147 (2012) (Reading Law)).*

The Court refers to this canon as a "rul[e] of grammar." *Ante,* at 5. Yet the Scalia-Garner treatise makes it clear that interpretive canons "are not 'rules' of interpretation in any strict sense but presumptions about what an intelligently produced text conveys." Reading Law 51. (Even grammar, according to Mr. Garner, is ordinarily just "an attempt to describe the English language as it is actually used." B. Garner, The Chicago Guide to Grammar, Usage, and Punctuation 1 (2016)). And Reading Law goes out of its way to emphasize the limitations of the series-qualifier canon, warning:

> "Perhaps more than most of the other canons, [the series-qualifier canon] is highly sensitive to context. Often the sense of the matter prevails: *He went forth and wept bitterly* does not suggest that he went forth bitterly." Reading Law 150.

The italicized sentence—an English translation of a sentence in the New Testament, Matthew 26:75—is not only grammatical; it is perfectly clear. No one familiar with the English language would fail to understand it—even though its meaning is contrary to the one suggested by the series-qualifier canon.

The Court writes that the series-qualifier canon "generally reflects the most natural reading of a sentence," *ante*, at 5, and *maybe* that is so. But cf. *Lockhart* v. *United States*, 577 U. S. 347, 351 (2016) (relying on "the basic intuition that when a modifier appears at the end of a list, it is easier to apply that modifier only to the item directly before it").

------

*As set out in Reading Law 147, this canon also applies when the modifier precedes the series of verbs or nouns.

Some scholars have claimed that "nobody proposed [the series-qualifier] canon until Justice Scalia pioneered it" in Reading Law. Baude & Sachs, The Law of Interpretation, 130 Harv. L. Rev. 1079, 1125 (2017) (internal quotation marks omitted; emphasis deleted).

ALITO, J., concurring in judgment

But it is very easy to think of sentences that clearly go against the canon:

> "At the Super Bowl party, she ate, drank, and cheered raucously."
> "On Saturday, he relaxes and exercises vigorously."
> "When his owner comes home, the dog wags his tail and barks loudly."
> "It is illegal to hunt rhinos and giraffes with necks longer than three feet."
> "She likes to swim and run wearing track spikes."

In support of its treatment of the series-qualifier canon, the Court offers this example of a sentence in which the natural reading corresponds with the interpretation suggested by the canon: "[S]tudents must not complete or check any homework to be turned in for a grade, using online homework-help websites." *Ante*, at 5.  I certainly agree that the adverbial phrase in this sentence ("using online homework-help websites") modifies both of the verbs it follows ("complete" and "check") and not just the latter.  But that understanding has little to do with syntax and everything to do with our common understanding that teachers do not want to prohibit students from doing homework.  We can see this point clearly if we retain the same syntax but replace the verb "complete" with any number of other verbs that describe something a teacher is not likely to want students to do, say, "ignore," "overlook," "discard," "lose," "neglect," "forget," "destroy," "throw away," or "incinerate" their homework.  The concept of "using online homework-help websites" to do any of those things would be nonsensical, and no reader would interpret the sentence to have that meaning—even though that is what the series-qualifier canon suggests.

The strength and validity of an interpretive canon is an empirical question, and perhaps someday it will be possible

ALITO, J., concurring in judgment

to evaluate these canons by conducting what is called a corpus linguistics analysis, that is, an analysis of how particular combinations of words are used in a vast database of English prose. See generally Lee & Mouritsen, Judging Ordinary Meaning, 127 Yale L. J. 788 (2018). If the series-qualifier canon were analyzed in this way, I suspect we would find that series qualifiers sometimes modify all the nouns or verbs in a list and sometimes modify just the last noun or verb. It would be interesting to see if the percentage of sentences in the first category is high enough to justify the canon. But no matter how the sentences with the relevant structure broke down, it would be surprising if "the sense of the matter" did not readily reveal the meaning in the great majority of cases. Reading Law 150.

That is just my guess. Empirical evidence might prove me wrong, but that is not what matters. The important point is that interpretive canons attempt to identify the way in which "a reasonable reader, fully competent in the language, would have understood the text at the time it was issued." *Id.,* at 33. To the extent that interpretive canons accurately describe how the English language is generally used, they are useful tools. But they are not inflexible rules.

Appellate judges spend virtually every working hour speaking, listening to, reading, or writing English prose. Statutes are written in English prose, and interpretation is not a technical exercise to be carried out by mechanically applying a set of arcane rules. Canons of interpretation can help in figuring out the meaning of troublesome statutory language, but if they are treated like rigid rules, they can lead us astray. When this Court describes canons as rules or quotes canons while omitting their caveats and limitations, we only encourage the lower courts to relegate statutory interpretation to a series of if-then computations. No reasonable reader interprets texts that way.

For these reasons, I respectfully concur in the judgment.